UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ERIKA SUQUILANDA,

   Plaintiff,

 - against -

COHEN & SLAMOWITZ, LLP and
ENCORE CAPITAL GROUP, INC. and
MRC RECEIVABLES CORPORATION and
MIDLAND CREDIT MANAGEMENT, INC.,

   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x



No. 10 Civ. 5868 (PKC)

**FIRST AMENDED CLASS
ACTION COMPLAINT**

\# 18

## NATURE OF ACTION

1. This is class action brought under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

3. Venue is proper before this Court pursuant to 28 U.S.C. §1391(b), where the acts and transactions giving rise to the plaintiff's action occurred in this State and this district, where the plaintiff resides in this State and this district, and where the defendants transact business in this State and this district.

## PARTIES

4.     Plaintiff Erika Suquilonda ("Plaintiff") is a natural person who at all relevant times resided in the State of New York, County of New York, and City of Bronx.

5.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3).

6.     Encore Capital Group, Inc. ("Encore") is a publicly traded Delaware corporation with principal executive offices situated at 8875 Aero Drive, Suite 200, San Diego, California.  Encore's common-stock is registered pursuant to Section 12(b) of the Securities and Exchange Act of 1934 and is listed on the NASDAQ Global Select Market under the symbol "ECPG."

7.     Encore is engaged in the business of purchasing and collecting delinquent debts originally owed to third parties.

8.     Encore is "debt collector" as defined by 15 U.S.C. § 1692a(6).

9.     MRC Receivables Corporation and Midland Credit Management, Inc. are under common control and ownership.  Both are owned and controlled by Encore.

10.     Defendant MRC Receivables Corporation ("MRC") is a Delaware corporation, with its principal place of business in San Diego, California.  MRC is a wholly owned subsidiary of Midland Portfolio Services, Inc., which is a wholly owned subsidiary of Midland Credit Management, Inc.

11.     MRC is engaged in the business of taking title to and collecting delinquent debts originally owed to third parties.

12.     MRC is "debt collector" as defined by 15 U.S.C. § 1692a(6).

13.     Defendant Midland Credit Management, Inc. ("MCM"), is a Kansas corporation with its principal place of business in San Diego, California. MCM is a wholly owned subsidiary of Encore.

14.     MCM is engaged in the business of collecting delinquent debts originally owed to third parties that are purchased by Encore and titled in the names of MRC or other Encore subsidiaries. MCM has a net worth exceeding $50,000,000.00. *See e.g. Sadler II v. Midland Credit Management, Inc. et al.*, No. 1:06-cv-05045 (N.D. Ill.) (Document 34-4 at 7).

15.     MCM is "debt collector" as defined by 15 U.S.C. § 1692a(6).

16.     Defendant, Cohen & Slamowitz, LLP ("C&S") is a limited liability partnership with its principal place of business in Woodbury, New York.

17.     C&S is in the business of collecting delinquent debts originally owed to third parties that are purchased by Encore, titled in the names of MRC or other Encore subsidiaries, and placed with MCM for collection.

18.     C&S is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

19.     Defendants Encore, MRC, MCM, and C&S act jointly and in concert to collect consumer debts incurred primarily for personal, family or household purposes.

20.     Encore secures funds from investors and lenders for the purpose of purchasing portfolios of charged-off consumer receivables to which MRC takes title. MRC places charged-off accounts with MCM for collection pursuant to a Servicing Agreement. MCM acts as a debt collector for debts purchased by MRC. MCM places charged-off accounts with C&S for collection pursuant to a Collection Agreement. C&S causes letters to be sent and files lawsuits to collect the accounts.

21.     Encore, MRC, MCM, and C&S are referred to jointly as Defendants.

### FACTUAL ALLEGATIONS

**I.    THE ENCORE CAPITAL GROUP OF COMPANIES.**

22.     Encore purchases portfolios of defaulted consumer receivables and manages their collection through its subsidiary entities.   Encore purchases deeply discounted charged-off consumer receivable portfolios from national financial institutions, major retail credit corporations, telecom companies and resellers of such portfolios.

23.     From its inception through June 30, 2009, Encore has invested approximately $1.3 billion to acquire 27 million consumer accounts with a face value of approximately $43 billion.

24.     During the three months ended September 30, 2010, Encore purchased receivable portfolios with a face value of $2.6 billion for $77.9 million, or a purchase cost of 3.0% of face value.   Encore's estimated future collections at acquisition for these portfolios amounted to $166.2 million.   Exhibit "B" (Encore Form 10–Q, filed October 26, 2010).

25.     Defendant Encore Capital Group, Inc. is a "debt collector" as defined by 15 U.S.C. § 1692a(6).  *See e.g. Herket v. MRC Receivables Corp.*, 655 F. Supp. 2d 870, 880 (N.D. Ill. 2009) (Encore Capital Group, Inc. is a debt collector); *See also  Miller v. Midland Credit Mgmt., Inc.*, 621 F.Supp.2d 621, 634-35 (N.D.Ill.2009) (finding Encore to be a debt collector under the FDCPA); *Hernandez v. Midland Credit Mgmt., Inc.*, No. 04 C 7844, 2007 WL 2874059, at *14-16 (N.D. Ill. Sept. 25, 2007) (same).

**A.      Portfolio Acquisitions.**

26.      Encore raises capital to acquire portfolios of accounts at deep discounts from their face value using a sophisticated valuation process that is based on the attributes of the underlying accounts.

27.      Acquisitions of receivable portfolios are financed by operations and by borrowings from third parties.

28.      Encore enters into Credit Agreements with third party financial lending institutions such as JPMorgan Chase Bank, N.A., Bank of America, N.A., Morgan Stanley Bank, N.A., and Citibank, N.A., pursuant to which revolving loans are made to Encore from time to time. *See e.g.* Encore Form 8K, February 8, 2010 at Exhibit 10.1 ("Credit Agreement dated as of February 8, 2010 by and among Encore Capital Group, Inc., the Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as administrative agent.").

29.      Once a receivable portfolio has been identified for potential purchase, Encore prepares quantitative analyses based on extracting customer level data from external sources, other than the issuer, to analyze the potential collectibility of the portfolio.    Encore also analyzes the portfolio by comparing it to similar portfolios previously acquired and serviced by Encore and its subsidiaries.

30.      Members of Encore's senior management, including key officers, materially control and participate in the acquisition and collection of portfolios of charged-off consumer receivables.

> Our management team has considerable experience in finance, banking, consumer collections and other industries. We believe that the expertise of our executives obtained by managing businesses across numerous other

industries has been critical to the enhancement of our operations. Our management team has created a culture of new ideas and progressive thinking, coupled with increased use of technology and statistical analysis. The loss of the services of one or more of our key executive officers could disrupt our operations and seriously impair our ability to continue to acquire or collect on portfolios of charged-off consumer receivables and to manage and expand our business. Our success depends on the continued service and performance of our management team, and we cannot guarantee that we will be able to retain such individuals.

(Encore Form 10–Q, filed October 26, 2010).

31.     Members of Encore's management perform qualitative analyses of other matters affecting the value of portfolios, including a review of the delinquency, charge off, placement and recovery policies of the originator as well as the collection authority granted by the originator to any third party collection agencies, and, if possible, by reviewing their recovery efforts on the particular portfolio.  Exhibit "C" (Encore Form 10K, 2001).

32.     After these evaluations are completed, Encore's Investment Committee, comprised of various members of our senior management, discusses the findings, decides whether to purchase and finalizes the price at which we are willing to purchase the portfolio. Exhibit "C" (Encore Form 10K, 2001).

33.     Title to the purchased portfolios is taken and held by Encore's indirect subsidiaries such as MRC or another Encore subsidiary such as NCC-2 Corp., or Midland Funding, LLC.

34.     MRC is referred to as a debt-owning company within the Encore family of businesses.

**B.     Dynamic Portfolio Collection Strategies.**

35.     Encore employs a "dynamic collections approach" under which it re-analyzes all of its accounts once each quarter with refreshed external data, which it supplements with information gleaned from its own collection efforts.  Encore modifies its collection method for each account if warranted.

36.     Encore's proprietary consumer level collectability analysis is the primary determinant of whether an account is actively worked post-purchase.  Throughout Encore's ownership period, it continuously refines this analysis to determine the most effective collection strategy to pursue for each account. These strategies consist of:

- outbound calling, driven by proprietary predictive software, by our own collection workforce located at our three domestic call centers and an international call center, through a majority-owned joint venture, in India;

- the use of a nationwide network of collection attorneys to pursue legal action where appropriate;

- the use of multiple third party collection agencies;

- direct mail campaigns coordinated by our in-house marketing group;

- the transfer of accounts to a credit card provider, generating a payment to us; and

- the sale of accounts where appropriate.

37.     Once receivables are ready to be worked, members of the Information Technology Department work directly with the head of Operations to discuss the specifics of the recent acquisition.  These discussions are useful because they allow the Information Technology Department to tailor Encore's proprietary account management system to reflect any special characteristics of the portfolio and Encore's collection strategy.  Exhibit "C" (Encore Current Report on Form 10K, for 2001).

38.     Pursuant to a Servicing Agreement by and among MRC Receivables Corporation, MCM, and CFSC Capital Corp. VIII, a Delaware corporation, MCM is responsible for managing and servicing the collection of the debts owned by Encore's debt-owning entities such as MRC, NCC-2 Corp., or Midland Funding, LLC. *See* Exhibit "D" (Servicing Agreement relating to the Secured Financing Facility, dated as of December 20, 2000 (incorporated by reference to Exhibit 10.8 to Encore's Current Report on Form 8-K filed on August 22, 2003)).

39.     MCM is referred to as a servicer within the Encore family of businesses.

40.     MCM only services and collects on the accounts to which MRC takes title.

41.     The Servicing Agreement grants MCM significant power and authority to conduct and manage the collection of the accounts to which MRC holds title, including, without limitation, the commencement of legal proceedings in MRC's name to collect accounts. Exhibit "D" at Section 2.5.

### C.     Legal Outsourcing Collection Channel.

42.     Encore's outsourced legal collections channel is comprised of more than 75 vendor relationships, delivers over $250 million in annual collections, and is supported by approximately 50 team members.

43.     Pursuant to certain written Collection Agreements between MCM and various law firms ("Firms"), Encore generally outsources those accounts where it appears the debtor is able, but is unwilling to pay.

44.     This process is managed by Encore's Legal Outsourcing Department.

45.     Pursuant to such Collection Agreements, Encore places accounts with the Firms from time to time for collection.

46.     The Collection Agreements control the manner in which the Firms must conduct collection activities on behalf of MCM in connection with the accounts owned by MRC.

47.     Specifically, the Collection Agreements require the Firms to abide by, and conduct all of their activities in a manner consistent with the then current "Procedures", which the Collection Agreement defines as "the Midland Account Handling Procedures, a copy of which is attached to this Agreement as Exhibit "E" and incorporated herein by this reference, which procedures may be modified by MCM from time-to-time in its sole and absolute discretion."

48.     MCM is required to provide advance notice of any modification of the Procedures to the Firms.

49.     The Collection Agreements contain bilateral indemnification provisions that allocate financial liability arising out of the Firms' collection efforts between Encore and the Firms.

50.     MRC and Encore are named as third-party beneficiaries of the Collection Agreements.

51.     The Collection Agreements provide for MCM's exercise of material control over each aspect of the Firms' collection efforts.

52.     The Collection Agreements confer upon MCM the right to conduct audits without notice at the expense of the Firms.

53.     The Collection Agreements require the Firms to obtain and provide proof of insurance policies to MCM.  The Firms are required to name MCM as loss payee in such policies.

54.     The Collection Agreements contain stringent daily reporting requirements pursuant to which the Firms make daily reports consisting of all information regarding any activity that occurs during that work day on any account received by the firm from MCM, including but not limited to, communications or attempted communications between the Firms and consumers and/or others.

55.     The Firms must also utilize MCM's Daily Invoicing Report, as part of its confirmation process relating to the successful upload of activity and payments, to confirm that those amounts the Firm believes were transmitted to MCM were received by MCM as part of each daily upload.

56.     The Firms must also maintain or acquire technology and resources sufficient to communicate and transmit and receive data with MCM in connection with the accounts placed with the firm.

57.     MCM issues user IDs and passwords to the Firms for the purpose of providing access to MCM's website and computer collections software and its information databases.

58.     Section 2.4.5 of the Collection Agreements require the Firms to maintain true, complete and accurate records, instruments, agreements, correspondence and other documentation, irrespective of the medium held, received or generated for a period of seven (7) years on all matters and activities:  (i) related to or arising in connection with each account; and (ii) arising out of or relating to the Collection Agreements.

59.     MCM has created a "Legal Outsourcing Firm Training Manual," which it has provided to various law firms collecting debts pursuant to the Collection Agreements.

*See e.g. Midland Funding, LLC v. Mansfield*, No. 3:09-cv-00358-L (D. Ariz.) at Document No. 60-2, pages 41-44 (Legal Outsourcing Firm Training Manual).

60.    Encore manages and exercises control over each aspect of the collection process including legal outsourcing. *See e.g.* Exhibit "A" (Encore Presentation, William Blair 4th Annual Emerging Growth Stock Conference, October 5, 2010).

61.    Encore's management is responsible for setting the strategic direction, managing all legal outsourcing operations and personnel, driving process improvements, managing the P&L, and ensuring that Encore's suppliers/vendors are competitive.

62.    Encore's Head of Legal Outsourcing oversees all Legal Outsourcing teams across the company, providing essential leadership and staff development consistent with overall company objectives and goals.

63.    Encore's or MCM's Director of Legal Outsourcing and Manage of Legal Outsourcing monitor and control the day-to-day operations of the Firms collecting MRC's accounts on behalf of MCM pursuant to the Collection Agreements.

64.    Through MCM, Encore advances certain out-of-pocket court costs such as filing fees.   Encore capitalizes these costs in its consolidated financial statements. Encore pays a fee to the respective attorneys based on an established fee schedule, as further defined in the Collection Agreements executed by the collection channel law firms and MCM on Encore's behalf.  Exhibit "C" (Encore Form 10K, 2001).

65.    The cost of Encore's legal collections was $33.9 million during the three months ended September 30, 2010.   These costs represent contingent fees paid to Encore's nationwide network of attorneys and costs of litigation.

66.   C&S is a law firm that has represented MRC under contract with MCM for several years.

67.   Upon information and belief, MCM placed Plaintiff's account with C&S pursuant to a Collection Agreement between MCM and C&S.

**B.   Defendants' Attempts to Collect An Alleged Consumer Debt From Plaintiff.**

68.   Plaintiff is a natural person obligated, or allegedly obligated, to pay a debt owed or due, or asserted to be owed or due an original creditor other than Defendants; namely, Citibank/Associates.

69.   Defendants use instrumentalities of interstate commerce or the mails in a business the principal purpose of which is the collection of any debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another.

70.   Plaintiff's obligation, or alleged obligation, owed or due, or asserted to be owed or due an original creditor other than Defendants, arises from a transaction or transactions in which the money, property, insurance, and/or services that are the subject of the transaction(s) were incurred primarily for personal, family, or household purposes.

71.   Defendants acquired Plaintiff's obligation, or alleged obligation, owed or due, or asserted to be owed or due an original creditor other than Defendants, when it was charged-off or in default.

72.   On or about April 1, 2010, Defendants printed and mailed, or caused to be printed and mailed, a letter a letter to Plaintiff in and effort to collect from Plaintiff an obligation, or alleged obligation, owed or due, or asserted to be owed or due an original creditor other than Defendants and which Defendants acquired after such obligation or

alleged obligation was charged-off or was in default. A true and correct copy of

Defendants' April 1, 2010, communication is attached hereto as exhibit "F" and set forth

below in full for ease of reference.

73.    The April 1, 2010, letter appears as follows:

P.O. BOX 9012
WOODBURY, NY 11797-9012          15503

**Law Offices of**
**Cohen & Slamowitz, LLP**
(516) 868-8950
(866) 542-8950
Fax (516) 908-7993

April 01, 2010

51*23444-01****AUTO**5-DIGIT 10459
Erika Suquilanda
1084 E 165th St Apt 1B
Bronx, NY 10459-2531

TAX SEASON SPECIAL DISCOUNT

Original Creditor: Citibank/Associates
Creditor: Midland Credit
Account: 5419310594916642
C&S File No. C152448
Index No: 61353705
Balance Due As Of April 01, 2010: $1,540.48

Dear Erika Suquilanda;

    Tax season is here, and hopefully you will be receiving a big refund check. Our firm is pleased to offer you a **savings of 50% off** on the outstanding balance owed on this account. Your balance due is currently $1,540.48; however, our client will accept the reduced sum of **$770.24** if you pay this amount on or before April 27, 2010. Upon receipt and clearance of your payment, your account will be deemed settled in full by our client.
    Payments should be forwarded directly to this office with the payment stub below. Our office accepts Western Union, Monygram, Mastercard, Visa, Discover Card and checks via telephone, or visit our website at WWW.CSLAWLLP.COM to make a payment online.
    We urge you to take advantage of this special opportunity to settle your account for pennies on the dollar. Kindly note that this offer to settle is void if you are refinancing or selling your house or if we have restrained your bank account.

                         Very Truly Yours,

                         Cohen & Slamowitz, LLP

**THIS COMMUNICATION IS FROM A DEBT COLLECTOR AND IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

 

Please detach and return this portion with your payment

| Credit Card Used For Payment | | | |
|---|---|---|---|
| ☐ Visa | ☐ MasterCard | ☐ Discover | |
| Card Number | | Amount | |
| Signature | | Exp Date | |

Original Creditor: Citibank/Associates
Creditor: Midland Credit
Account: 5419310594916642
C&S File No. C152448
Index No: 61353705

Erika Suquilanda
1084 E 165th St Apt 1B
Bronx, NY 10459-2531

TAX SEASON SPECIAL DISCOUNT

COHEN & SLAMOWITZ, LLP
P.O. BOX 9001
WOODBURY, NY 14797-9001

**DUE DATE:** April 27, 2010

**CURRENT BALANCE:** $1,540.48
**TAX TIME SAVINGS:** $770.24
**REDUCED BALANCE:** $770.24
(if paid by due date)

AMOUNT ENCLOSED $_____

Exhibit "F".

74.     On or about April 26th, 2010, Plaintiff telephoned C&S to discuss the offer contained in the April 1, 2010, letter.  Plaintiff was informed that it was too late to accept the offer.  Plaintiff was further informed that Defendants had already submitted documentation to Plaintiff's bank to seize her account.

75.     Defendant served an Information and Subpoena and Restraining Notice on Plaintiff's bank alleging that Plaintiff owed $1,127.80.  At approximately the same time, Defendant sent a letter to Plaintiff alleging that she owed a total of $1,540.48 in connection with the same account.  Both cannot be true.

76.     Defendants, as a matter of pattern and practice, mail letters, or cause the mailing of letters, to debtors using language substantially similar or materially identical to that utilized by Defendant in mailing the above-cited letter to Plaintiff.

77.     Defendants mail, or cause the mailing of, thousands of collection letters like the one sent Plaintiff without conducting any meaningful review of the accounts.

78.      The letters Defendants mail, or cause to be mailed, are produced by Defendants' concerted efforts and integrated or shared technologies including computer programs, mailing houses, and electronic databases.

79.     The April 1, 2010, communication is a standardized form letter.

## CLASS ALLEGATIONS

80.     Plaintiff brings this action on behalf of herself and all others similarly situated.  Specifically, Plaintiff seeks to represent a class of individuals defined as:

> All persons located in the Second Circuit who, within one
> year before the date of the original complaint, received a

> letter from "Law Offices of Cohen & Slamowitz, LLP"
> identifying Citibank/Associates as the original creditor and
> "Midland Credit" as the creditor.

81.     The proposed class specifically excludes the United States of America, the states of the Second Circuit, counsel for the parties, the presiding United States District Court Judge, the Judges of the United States Court of Appeals for the Second Circuit and the United States Supreme Court, all officers and agents of Defendants and all persons related to within the third degree of consanguinity or affection to any of the foregoing individuals.

82.     The class is averred to be so numerous that joinder of members is impracticable.

83.     The exact number of class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery.

84.     The class is ascertainable in that the names and addresses of all class members can be identified in business records maintained by Defendant.

85.     There exists a well-defined community of interest in the questions of law and fact involved that affect the parties to be represented.  These common questions of law and fact predominate over questions that may affect individual class members.  Such issues include, but are not limited to: (a) The existence of Defendants' identical conduct particular to the matters at issue; (b) Defendants' violations of 15 U.S.C. §1692 *et. seq.*; and (c) The availability of statutory penalties; and (d) Attorney's fees and costs.

86.     The claims of Plaintiff are typical of those of the class she seeks to represent.

87.     The claims of Plaintiff and of the class originate from the same conduct, practice, and procedure, on the part of Defendants.   Thus, if brought and prosecuted individually, the claims of each class member would require proof of the same material and substantive facts.

88.     Plaintiff possesses the same interests and has suffered the same injuries as each class member.   Plaintiff asserts identical claims and seeks identical relief on behalf of the unnamed class members.

89.     Plaintiff will fairly and adequately protect the interests of the class and has no interest adverse to or which directly and irrevocably conflicts with the interests of other members of the class.

90.     Plaintiff is willing and prepared to serve this Court and proposed class.

91.     The interests of Plaintiff are co-extensive with and not antagonistic to those of the absent class members.

92.     Plaintiff has retained the services of counsel who are experienced in consumer protection claims, as well as complex class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent Plaintiff and all absent class members.

93.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B).   The prosecution of separate actions by individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

94.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the parties opposing the class.   Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the class.

95.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

96.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to members of the class predominate over any questions affecting only individual members.

97.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that: (a) individual claims by the class members will be impracticable as the costs of pursuit would far exceed what any one plaintiff or class member has at stake; (b) as a result, very little litigation has been commenced over the controversies alleged in this Complaint and individual members are unlikely to have interest in prosecuting and controlling separate individual actions; (c) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy.

## COUNT I

98.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 97.

99.    15 U.S.C. § 1692e(14) provides:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> *     *     *
>
> (6) The use of any business, company, or organization name other than the true name of the debt collector's business, company or organization.

100.   The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. "Without limiting the general application of the foregoing," the statute sets forth various conduct that is a violation of § 1692e.  Included in the enumeration of prohibited acts is "[t]he use of any business, company, or organization name other than the true name of the debt collector's business, company or organization." *Id.* at 1692e(14).

101.   The name under which a debt collector is licensed to do business is the debt collector's "true name" for purposes of the FDCPA. *Moore v. National Account Systems, Inc.,* No. 91-CV-35, 1991 WL 313896, *1, (D. Conn. Nov. 13, 1991) (holding that the name under which a debt collector is licensed to do business is the debt collector's "true name" for purposes of the FDCPA). *Accord Orenbuch v. N. Shore Health Sys., Inc.,* 250 F. Supp. 2d 145, 152 (E.D. N.Y. 2003).

102.    C&S is registered by the New York State Department of State, Division of Corporations under the name "Cohen & Slamowitz, LLP".   Exhibit ("G").  No fictitious names are registered.

103.    C&S is registered and licensed as a debt collection agency by the New York City Department of Consumer Affairs under the name "Cohen & Slamowitz, LLP" (License #1160860).

104.    The April 1, 2010, letter identifies Cohen & Slamowitz, LLP, as "Law Offices of Cohen & Slamowitz, LLP." Exhibit "G".

105.    C&S's true name is "Cohen & Slamowitz, LLP", its name is not "Law Offices Cohen & Slamowitz, LLP." Exhibit "H"

106.    Although C&S may technically be a law firm, it was not acting in the capacity of a law firm with respect to the April 1, 2010, letter.  The inclusion of "Law Offices" is therefore materially deceptive and misleading in that it communicates to the least sophisticated consumer that the communication came from a law firm in a practical sense, when it did not.

107.    If C&S desires to take advantage of the additional collection leverage provided by the use of a law firm's name in connection with purely debt-collection related activities, it is free to do so under the law of the Second Circuit; so long as its letters do not give the least sophisticated consumer the impression that the letters it sends are from an attorney or law firm in the practical sense. *See e.g. Clomon v Jackson*, 988 F2d 1314, 1320 (2d Cir. 1993).  C&S may not however use a false name to create such leverage — under any circumstance.

108.    Suppose for example that a collection agency not engaged in the practice of law is registered to do business in the State of New York and holds a debt collection license from the City of New York under the name "John & Doe, LLP".  And imagine that "John & Doe, LLP", acting as a debt collector, mails collection letters prominently bearing the name "Law Offices of John & Doe, LLP" to consumers to collect debts.  The use of this false name would violate Section 1692e(14).  It makes sense that whether "John & Doe, LLP" or C&S practice law at other times is immaterial because neither was acting in that capacity when they mailed the letters.  Thus the false addition of "Law Offices" to either name is deceptive and misleading.

109.    Defendant Cohen & Slamowitz, LLP, violated 15 U.S.C. § 1692e(14) by using a business, company, or organization name other than the true name of its business, company or organization.  Defendants MCM, MRC, and Encore are jointly and severally liable for such violations under the laws of agency, contract, and the FDCPA.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

   a.   Determining that this action is a proper class action, certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint the operable complaint for class purposes;

   b.   Adjudging that Defendants violated 15 U.S.C. § 1692e(14).

   c.   Awarding Plaintiff, and all those similarly situated, statutory damages, pursuant to 15 U.S.C. §1692k, in the amount of $1,000.00 per class member.

    d.  Awarding Plaintiff, and all those similarly situated, their reasonable attorneys' fees ands costs incurred in this action, including counsel fees and expert fees;

    e.  Awarding Plaintiff, and all those similarly situated, any pre-judgment and post-judgment interest as may be allowed under the law;

    f.  Awarding such other and further relief as the Court may deem just and proper.

## COUNT II

110.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 109.

111.    15 U.S.C. § 1692e(10) provides:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
>     *      *      *
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

112.    Defendants used the April 1, 2010, letter to collect or attempt to collect an alleged consumer debt from Plaintiff.

113.    The April 1, 2010, letter falsely represents "Midland Credit" to be the creditor.

114.    Upon information and belief, Encore negotiated the purchase of a portfolio of charged-off consumer receivables with Citibank that included Plaintiff's account. Encore used MRC to purchase and take title to the portfolio.

115.    MRC admits that it "purchased a debt owed by Plaintiff." Document No. 13 at ¶15. By acquiring legal title, MRC became the creditor.

116.    Upon information and belief, MRC placed Plaintiff's account with MCM for collection pursuant to the Servicing Agreement. MCM placed Plaintiff's account with C&S pursuant to a Collection Agreement. *See Supra* at **I B, C.**

117.    Assuming that "Midland Credit" means MCM, legal title did not transfer from MRC to MCM, or otherwise vest in MCM at any time. MCM acts as a debt collector for the Encore debt-owning companies such as MRC. MCM does not purchase or take title to consumer debt portfolios.

118.    MCM was not any time relevant Plaintiff's creditor.

119.    On April 29, 2010, Plaintiff received a separate letter from Defendants identifying MRC Receivables Corp. as the creditor. This letter was sent in response to Plaintiff's payment that settled the alleged debt in full. Exhibit "I".

120.    The account information detailed by the April 1, 2010, letter matches exactly with that contained in the April 29, 2010, letter; except for the name of the creditor (account number, original creditor, C&S File No., and Index No.).

121.    Defendants' misrepresentation of "Midland Credit" as Plaintiff's creditor is particularly misleading in that no person or entity is registered to do business in New York State as "Midland Credit".

122.   Midland Credit Management, Inc., and Midland Credit Corp., are both registered to do business in New York State, but the least sophisticated consumer would have no way to determine which entity Defendants' April 1, 2010, letter refers to.

123.   To the extent that MCM, MRC, or Encore provided such information to C&S, such information was provided with gross negligence, and/or reckless disregard for its accuracy.

124.   To the extent that MCM, MRC, or Encore provided such information to C&S, such conduct independently violates 15 U.S.C. 1692e(14).

125.   Defendants violated 15 U.S.C. § 1692e(10) by falsely representing that "Midland Credit" was Plaintiff's creditor.

126.   WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   Determining that this action is a proper class action, certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint the operable complaint for class purposes;

b.   Adjudging that Defendants violated 15 U.S.C. § 1692e(10).

c.   Awarding Plaintiff, and all those similarly situated, statutory damages, pursuant to 15 U.S.C. §1692k, in the amount of $1,000.00 per class member.

d.   Awarding Plaintiff, and all those similarly situated, their reasonable attorneys' fees ands costs incurred in this action, including counsel fees and expert fees;

     e.   Awarding Plaintiff, and all those similarly situated, any pre-judgment and post-judgment interest as may be allowed under the law;

     f.   Awarding such other and further relief as the Court may deem just and proper.

## COUNT III

127.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 126.

128.    15 U.S.C. § 1692f provides:

> A debt collector may not use unfair or unconscionable
> means to collect or attempt to collect any debt.

15 U.S.C. § 1692f.

129.    Conduct enumerated by 15 U.S.C. § 1692f was not intended to limit the applicability of the general prohibition of "unfair or unconscionable" behavior. *McMillan v. Collection Professionals Inc.*, 455 F. 3d 754 (7th Cir. 2006).

130.    15 U.S.C. §1692f "serves a backstop function, catching those "unfair practices" which somehow manage to slip by §§ 1692d & 1692e." *Edwards v. McCormick*, 136 F. Supp. 2d 795 (S.D. Ohio 2001).

131.    15 U.S.C. §1692f "allows the court to sanction improper conduct that the FDCPA fails to address specifically." *Adams v. Law Offices of Stuckert & Yates,* 926 F. Supp. 521, 528 (E.D. Pa. 1996), citing *Masuda v. Thomas Richards & Co.,* 759 F. Supp. 1456, 1461 n. 10 (C.D. Cal. 1991).

132.    Defendants violated 15 U.S.C. § 1692f by engaging in the grossly negligent ultra-high volume collection of consumer debts in a manner which exhibits near total disregard for the rights of Plaintiff and the members of the putative class.

133.    Defendant C&S independently violated 15 U.S.C. § 1692f by using a false name to reinforce the fact that C&S is technically a law firm even though not acting as one in any meaningful sense with respect to the April 1, 2010, letter.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   Determining that this action is a proper class action, certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint the operable complaint for class purposes;

b.   Adjudging that Defendants violated 15 U.S.C. § 1692f.

c.   Awarding Plaintiff, and all those similarly situated, statutory damages, pursuant to 15 U.S.C. §1692k, in the amount of $1,000.00 per class member.

d.   Awarding Plaintiff, and all those similarly situated, their reasonable attorneys' fees ands costs incurred in this action, including counsel fees and expert fees;

e.   Awarding Plaintiff, and all those similarly situated, any pre-judgment and post-judgment interest as may be allowed under the law;

f.   Awarding such other and further relief as the Court may deem just and proper.

## COUNT IV
### [Individual Claim]

134.    Plaintiff incorporates and re-alleges each and every allegation contained in paragraphs 1 through 79.

135.    Plaintiff brings this claim in her individual capacity.

136.   15 U.S.C. § 1692e(2)(a) provides:

> A debt collector may not use any false, deceptive, or mis-leading representation or means in connection with the col-lection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> \*        \*        \*
>
> (2)      The false representation of—
>
> (A) the character, amount, or legal status of any debt. . . .

15 U.S.C. § 1692e(2)(a).

137.   Defendants violated 15 U.S.C. § 1692e(2)(A) by falsely representing the character, amount, or legal status of Plaintiff's alleged debt.

138.   Defendants provided Plaintiff with two conflicting statements of the amount of the alleged debt.

139.   Defendants represented a debt-settlement offer to Plaintiff that Plaintiff was told she could accept at any time prior to April 27, 2010.  Before the offer period had lapsed, Plaintiff called Defendants and was informed that the offer was void.  The period had not lapsed.

140.   Defendants offer was misleading in that Defendant took action during the offer period that was wholly inconsistent with the nature of the offer as a settlement of Plaintiff's alleged debt.

141.   Defendants have violated 1692e and 1692e(2)(A) with respect to Plaintiff individually.

WHEREFORE, Plaintiff prays for relief and judgment for this individual claim as follows:

g. Adjudging that Defendants violated 15 U.S.C. §§ 1692e and 1692e(2)(A).

h. Awarding Plaintiff statutory damages, pursuant to 15 U.S.C. § 1692k, in the amount of $1,000.00.

i. Awarding Plaintiff her reasonable attorneys' fees ands costs incurred in this action, including counsel fees and expert fees;

j. Awarding Plaintiff any pre-judgment and post-judgment interest as may be allowed under the law;

k. Awarding Plaintiff actual damages, pursuant to 15 U.S.C. §1692k, in an amount to be determined by the jury.

l. Awarding such other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

142. Plaintiff is entitled to and hereby demands a trial by jury on all counts.

Dated: Thursday, November 04, 2010, and respectfully submitted,

WEISBERG & MEYERS, LLC

By: s/Dennis R. Kurz
NY Bar No. 4570453
Attorneys for Plaintiff
*Weisberg & Meyers, LLC*
80 Broad Street, 5th Floor
New York, NY 10004
(888) 595-9111 ext. 412
(866) 842-3303 (fax)
dkurz@attorneysforconsumers.com

*Attorneys for the plaintiff*
ERIKA SUQUILONDA